IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

RONNIE L. DEXTER,

      Plaintiff,

v.                               CASE NO. 1:16-cv-369-WTH-GRJ

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for supplemental security income ("SSI") pursuant to Title XVI

of the Social Security Act. (ECF No. 1.) The Commissioner has answered,

(ECF No. 10), and both parties have filed briefs outlining their respective

positions. (ECF Nos. 19, 20.) For the reasons discussed below, the

Commissioner's decision is due to be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed his application for SSI on July 29, 2013, alleging a

disability onset date of May 23, 2013. (R. 74, 84, 213–18.) His application

was denied initially and upon reconsideration. (R. 73–82, 85–98, 103–12.)

Following a hearing and a supplemental hearing, an administrative law judge ("ALJ") issued a decision unfavorable to Plaintiff on July 28, 2016. (R. 15–31.) The Appeals Council denied Plaintiff's request for review on October 14, 2016. (R. 1–4.) Plaintiff then filed the instant appeal on December 13, 2016. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. §§ 404.1505, 416.905 (2015).[1] The impairment must be severe, making Plaintiff unable to do her

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511, 416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, she is not disabled. §§ 404.1520(b), 416.920(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. §§ 404.1520(c), 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f), 416.920(e)–(f). Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. §§ 404.1520(g), 416.920(g).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

### III.  SUMMARY OF THE RECORD

Because Plaintiff's only issue on appeal is whether substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 12.05(C) regarding an intellectual disability, the relevant portions of the medical record, opinion evidence, hearing testimony, and ALJ's decision are summarized below.

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

## A.    Medical Evidence

Plaintiff visited the emergency department of Shands in July 2013 regarding pain in his left shoulder and pain and numbness to his arm, and he returned again in September 2013 regarding a cough and chest and lower back pain. The records do not contain any mention of mental health issues or diagnoses or any intellectual disability, and Plaintiff's neurological, psychiatric, and psychological examinations revealed normal findings. (R. 322–29, 331–46.)

In May 2014 Plaintiff visited Meridian Behavioral Healthcare. Plaintiff had a severe depressed and anxious mood, but his behavior and activity were cooperative and appropriate. Plaintiff was diagnosed with post-traumatic stress disorder and depressive disorder by Karen Rye, ARNP. (R. 352–59.)

Then in December 2014 Plaintiff visited the emergency department at North Florida Regional Medical Center regarding back pain. Again, however, there is no mention of mental health issues or diagnoses or any kind of intellectual disability. And his neurological and psychiatric exams revealed normal findings. (R. 360–68.)

**B.    Opinion Evidence**

**1. Keith Bauer, Ph.D.**

At the initial level, Dr. Bauer performed a psychiatric review of Plaintiff. He noted that Plaintiff had no mental health treatment and no prescription for psychotropic medication, although Plaintiff had a long history of being diagnosed with an adjustment disorder. Dr. Bauer found that Plaintiff's physical exams and mental status exams were within normal limits, and the evidence did not support Plaintiff having any significant limitations due to a mental impairment. (R. 78.)

**2. Heather Hernandez, Ph.D.**

On reconsideration, Dr. Hernandez completed a mental residual functional capacity assessment. Although she found that Plaintiff did have some moderate limitations, she concluded that he is capable of sustaining goal-directed activity in a routine setting with limited social contact. (R. 94–96.)

**3. Diana Benton, Psy.D.**

Dr. Benton conducted a clinical evaluation with a mental status assessment of Plaintiff and completed a mental functional capacity form. On the form, she noted that Plaintiff had mild limitations in the ability to

make judgments on simple work-related decisions; moderate limitations in Plaintiff's ability to understand and remember complex instructions and his ability to carry out complex instructions; and between moderate and marked limitations in Plaintiff's ability to make judgments on complex work-related decisions. The only explanation for these limitations stated on the form, however, was that Plaintiff "reported that he was enrolled in ESE throughout school and has difficulty with academic tasks." (R. 370–72.)

Dr. Benton also completed a more lengthy psychological evaluation of Plaintiff. Plaintiff reported a depressed mood, diminished interest in activities, difficulties sleeping, a diminished appetite, and lifelong difficulty concentrating. Dr. Benton noted that Plaintiff rode his bike 20 minutes to the appointment, he interacted with the staff appropriately, and he was fully cooperative. Additionally, Plaintiff expressed that he thought he could work full-time if his hours were increased at his present part-time job. (R. 373–74.)

Plaintiff also discussed his mental health and his daily living. Plaintiff stated that he did not take psychotropic medication and was not being treated for mental health concerns. He also stated that he can perform all necessary self-care activities as well as cook, clean, grocery shop, and manage finances. However, he mentioned that he can only read "very little"

and said he has dyslexia. Plaintiff also said that he interacts with people at work and in his neighborhood. He also goes to church twice a month and helps others around the house. (R. 374–75.)

Dr. Benton performed a mental status exam of Plaintiff. The findings were primarily normal, although Plaintiff did have a depressed mood with congruent affect. His memory appeared intact, although he was unable to spell "world." He was also able to name the current U.S. president and several past presidents as well as complete some subtraction, addition, and simple multiplication. As a result, Dr. Benton concluded that Plaintiff "appears to have adequate capacity in the areas of understanding, memory, concentration, persistence, social interaction and adaptation to perform work for which he is suited." (R. 375–76.)

### 4. William Beaty, Ph.D.

Dr. Beaty performed a personality evaluation of Plaintiff and administered an IQ test. Dr. Beaty discussed Plaintiff's education, noting that he left school in 9th grade, took ESE classes where he made C's and D's, and had behavioral and learning problems, including problems in language development. Dr. Beaty also discussed his activities of daily living, which include performing hygiene, light house cleaning, grocery

shopping, and working part-time at his janitorial job. (R. 390–91.)

Regarding the mental status exam, Plaintiff's speech, thought process, and thought content were normal. He was able to count backwards and recite the alphabet, although he did have difficulty with some of the mental math computations. He was verbally responsive, but he did have poor insight and abstract ability. He was also able to recall three digits forward, three digits backwards, and two of three words after five minutes. Although he would confuse dates, he was able to give a roughly coherent account of his life. (R. 391–92.)

Dr. Beaty also administered the Wechsler Adult Intelligence Scale (WAIS IV). Plaintiff followed directions and made good effort. The results of that test were as follows:

> While his Full Scale score was in the Mild range of intellectual disability, his verbal comprehension and perceptual reasoning scores were in the Borderline range, and that together with his count of his adaptive day-to-day behaviors led to the diagnosis of Borderline Intellectual Deficit. Memory measures were in the Deficient range, and this was apparent in his interview as his account of events was sometimes confusing in coordination of dates and his age. In the Verbal domain, his ability to abstract verbally and provide the meaning of words was Borderline, although his fund of cultural information was in a deficient range. His ability to solve visual puzzles was low Average and his ability to construct block designs from pictures was in the Borderline range, although his ability to solve visual reasoning tasks was in the Deficient range.

(R. 392.)

Specifically, with regard to this test, Dr. Beaty found that Plaintiff's

Full Scale score was 65. He also noted that Plaintiff's adaptive behaviors

are higher than his IQ test scores. Further, Dr. Beaty noted that Plaintiff

has shown some adaptability in surviving on the street since age 15.

Overall, Plaintiff was diagnosed with Borderline Intellectual Functioning,

Persistent Depressive Disorder, Unspecified Disruptive, Impulse-Control

and Conduct Disorder, and Alcohol Use Disorder, in remission. (R.

392–99.)

**C.   Hearing Testimony**

At the first hearing held on January 15, 2016, Plaintiff's

representative argued that Plaintiff meets Listing 12.05(C). With regard to

adaptive functioning, she argued that although Plaintiff has held a number

of jobs, the managers at the locations where he held jobs the longest knew

him and offered him additional accommodations. Further, she pointed to

Plaintiff's school records, difficulty reading, and behavioral issues prior to

age 22 and the fact that Plaintiff has been unable to pass the test to

acquire his driver's license. (R. 49–52.)

Plaintiff testified that the highest level of education he completed was 9th grade, and he said he stopped because he did not know how to read well. In school he was in special education classes. At the time of the hearing he said he could only read and write a little. Plaintiff also said that since the day his case was denied, his physical condition has worsened and that he has a hard time comprehending. (R. 54–56, 64.)

Plaintiff also testified about his past work, although he could not remember all of the dates. He said he worked at Piccadilly Cafeteria as a dish washer and line server and that he left because they went out of business. He said if they had not gone out of business, he would probably still work there. He also said, however, that he had difficulty completing some of the tasks, specifically when he was told to do multiple things at one time. He also worked at Peach Valley Café around the same time in 2013 as a prep cook and dish washer, but he was fired because he could not focus after his Mom passed away. Plaintiff also worked as a piper, glasscutter at Seabring Marine Industries in 2003, where he learned to modify boats with the help of their training. He was laid off from that job because he had too many absences. (R. 58–61, 64–65.)

Since May 2013, Plaintiff said he earns money doing odd jobs for people, such as raking yards, cutting grass, washing cars, and performing other maintenance and repair. At the time of the hearing, he was working two days a week at Pizza Hut panning pizza. He said they only offered him part-time work, but he said he would work full-time if they would hire him. (R. 61–62.)

Plaintiff mentioned that he lives with friends. On his days off, he watches TV and does chores around the house. He testified that there are not any household chores that he is unable to do. (R. 62–63.)

With regard to his mental health issues, Plaintiff said he went to Meridian Behavioral Healthcare in 2013 because he was having thoughts of harming himself. He also said that when he is around a big crowd of people he gets anxiety attacks. (R. 65–68.)

At the supplemental hearing held on July 8, 2016, Plaintiff testified that since the last hearing he has worked. Specifically, at the time of the supplemental hearing he was working for a temp service called ISS as a cleaner part-time. Prior to that job, he worked as a prep cook for Pizza Hut. Plaintiff said he worked part -time because that was the only hours they offered him, but if they offered him full-time work he would try to do that.

Further, Plaintiff testified that he did not have any new medical conditions that he did not have at the last hearing. (R. 34–40.)

## D.   The ALJ's Findings

The ALJ found that Plaintiff probably has not engaged in substantial gainful activity since July 29, 2013, the application date. The ALJ noted, however, that Plaintiff has worked since the application date—although the work likely does not rise to the level of substantial gainful activity—based on Plaintiff's testimony that he performs odd jobs such as raking, fixing windows, painting, washing cars, and working part-time two days a week at Pizza Hut. Further, at the supplemental hearing Plaintiff testified that he was working part-time as a cleaner for ISS. (R. 20.)

At step two the ALJ found that Plaintiff has the severe impairments of arthritis status post left elbow, right wrist, and right leg fractures in 2004. With regard to Plaintiff's mental impairments of borderline intellectual functioning, an affective disorder, and an anxiety-related disorder, the ALJ found that they caused no more than minimal limitation in Plaintiff's ability to perform basic mental work activities and that they caused no more than mild limitation in the three functional areas and produced no episodes of decompensation. Therefore, the ALJ found that they were nonsevere (R.

20–21.)

Additionally, with regard to Plaintiff's assertion that he meets Listing

12.05(C), the ALJ found

> that the adaptive functioning requirements are not met, and this
> is consistent with the opinion of Dr. Beaty, who performed IQ
> testing at the representative's request (Exhibit C8F). Dr. Beaty
> noted that the claimant's adaptive behaviors are higher than his
> test scores, and further concluded that he is capable of
> managing his own finances. The evidence indicates that the
> claimant has engaged in work at substantial gainful activity
> levels, and he continues to work. He also testified that he
> performs odd jobs, so he likely has some unreported income.
> Further, the claimant's treating sources have not indicated
> "intellectual disability" as an issue.

(R. 22.)

At step three of the evaluation, the ALJ found no impairment or

combination of impairments that meets or medically equals the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

1, which includes Listing 12.05. (R. 22.)

The ALJ further found that Plaintiff has the residual functional

capacity to perform the full range of medium work a defined in 20 C.F.R. §

416.967(c). Then, at step four the ALJ found Plaintiff capable of performing

past relevant work as a kitchen helper. Accordingly, the ALJ concluded that

Plaintiff has not been under a disability, as defined in the Social Security

Act, since July 29, 2013. (R. 22–26.)

## IV.  Discussion

Plaintiff argues substantial evidence does not support the ALJ's finding at step three that Plaintiff does not meet the requirements of Listing 12.05(C). Specifically, Plaintiff contends his IQ score of 65 and his severe impairments of arthritis status post left elbow, right wrist, and leg fractures in 2004 meet the requirements of Listing 12.05(C) in effect at the time of the ALJ's decision. Additionally, Plaintiff says that he has deficits in adaptive functioning, including but not limited to a 9th grade education, placement in ESE (exceptional student education) classes, the school board requiring him to repeat 7th and 8th grade, problems reading, and significant problems with the law. Therefore, Plaintiff says this evidence should necessitate a finding that Plaintiff is disabled. (ECF No. 19 at 20–24.)

Under step three of the evaluation, a claimant who meets or equals a listing is entitled to disability benefits. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration

requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 404.1525(a)–(d)). "To 'equal' a Listing, the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Id.* (quoting 20 C.F.R. § 404.1526(a)). The claimant has the burden of proving that his impairments meet or equal a listed impairment by presenting specific medical signs, symptoms, or laboratory tests that meet all of the specified criteria. *Curry v. Astrue*, 650 F. Supp. 2d 1169, 1176 (N.D. Fla. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

At the time of the ALJ's decision on January 28, 2016, Listing 12.05 (Intellectual Disability)[3] required that the claimant's impairment satisfy the three diagnostic criteria listed in the introductory paragraph of the listing and one of the four requirements in A–D. *See* 20 C.F.R. Part 404, Subpt. P, App.1, §§ 12.00(A), 12.05.[4]

---

[3] On August 1, 2013, the Social Security Administration changed the terminology in Listing 12.05 from "mental retardation" to "intellectual disability." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01, 2013 WL 3936340, at *46499 (Aug. 1, 2013). The change, however, did not affect how a claim is evaluated under Listing 12.05. *Id.* at *46500.

[4] A revised version of Listing 12.05 took effect on January 17, 2017, which changed the requirements for Listing 12.05. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, 2016 WL 5341732 (Sept. 26, 2016). This Court, however, reviews the ALJ's decision using the version of Listing 12.05 in effect at the time of the decision in July 2016. *See id.* at 66138 n. 1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

In other words,

> [t]o be considered for benefits under Listing 12.05, the claimant must meet the "diagnostic criteria" in the introductory paragraph of the listing, which are (i) significantly subaverage general intellectual functioning (ii) with deficits in adaptive functioning (iii) that manifested before age twenty-two. *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997); 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00(A), 12.05.

> In addition to the diagnostic criteria, a claimant must satisfy any one of the four sets of criteria contained in subsections A–D. Under subsection C, the only subsection at issue here, a claimant must show that she has both "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05(C). A claimant's "severe impairment," as determined at step two, qualifies as an impairment imposing additional and significant work-related limitation of function for purposes of the second prong of subsection C. *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1515 (11th Cir. 1985).

*Jones v. Soc. Sec. Admin., Comm'r*, 695 F. App'x 507, 508–09 (11th Cir. 2017).

In this case, substantial evidence supports the ALJ's finding that Plaintiff does not meet Listing 12.05(C). In making that finding, the ALJ reasoned that "the adaptive functioning requirements are not met." The ALJ noted that this finding is consistent with Dr. Beaty's opinion, the evidence that Plaintiff has engaged in substantial gainful activity and continues to work, Plaintiff's testimony that he performs odd jobs, and the

lack of evidence of "intellectual disability" from any of Plaintiff's treating

doctors. (R. 22.)

As an initial matter, the Commissioner concedes that Plaintiff meets

the requirements listed in subsection C of Listing 12.05. Plaintiff has a valid

full-scale IQ of 65, and the severe impairments the ALJ found of arthritis

status post left elbow, right wrist, and right leg fractures in 2004 qualify as

the necessary other impairment "imposing an additional and significant

work-related limitation of function." *See* 20 C.F.R. Part 404, Subpt. P,

App.1, § 12.05(C). However, as stated above, satisfying the requirements

of subsection C without also meeting the requirements in the introductory

paragraph of Listing 12.05 is insufficient to show that Plaintiff meets Listing

12.05. *See* 20 C.F.R. Part 404, Subpt. P, App.1, §§ 12.00(A), 12.05;

*Jones*, 695 F. App'x at 508–09.

Thus, the relevant inquiry is more specifically whether substantial

evidence supports the ALJ's finding that the adaptive functioning

requirements are not met.[5] Because Plaintiff's IQ score is within the 60–70

---

[5] According to the Eleventh Circuit, "Even though the SSA has not specifically defined 'deficits in adaptive functioning,' the Diagnostic and Statistical Manual of Mental Disorders ('DSM') states that adaptive functioning 'refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological background, and community setting.'" *O'Neal v. Comm'r of Soc. Sec.*, 614 F. App'x 456, 459 (11th Cir. 2015) (quoting DSM-IV-TR at 42).

range, a rebuttable presumption is created that he manifested deficits in adaptive functioning prior to the age of twenty-two. *Jones*, 695 F. App'x at 508–09 (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1268–69 (11th Cir. 2001)). However, this IQ score is not determinative of intellectual disability where it is "inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *see also Popp v. Heckler*, 779 F.2d 1497, 1500 (11th Cir. 1986) ("[T]he ALJ was not required to find that [the claimant] was mentally retarded based on the results of the IQ test. The ALJ is required to examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior."). "In other words, evidence of a claimant's daily activities and behavior may show that the claimant has a greater degree of adaptive functioning than suggested by his IQ scores." *Jones*, 695 F. App'x at 509. Therefore, the ALJ may find that the presumption has been rebutted by relying on such evidence. *Id.*

Here, the ALJ correctly found that based on Plaintiff's daily activities and behavior he has a greater degree of adaptive functioning from that suggested by his IQ score, revealing that Plaintiff lacked the requisite adaptive functioning deficit of Listing 12.05. In reaching this determination,

the ALJ relied specifically on Dr. Beaty's opinion, Plaintiff's work experience, medical records from Plaintiff's treating doctors, and Plaintiff's testimony. (R. 22.)

In relying on Dr. Beaty's opinion, the ALJ specifically wrote that "Dr. Beaty noted that the claimant's adaptive behaviors are higher than his test scores, and further concluded that he is capable of managing his own finances." (R. 22.) Dr. Beaty's findings were based on Plaintiff's personality evaluation, mental status examination,[6] and IQ test, as well as Plaintiff's testimony during the appointment. Dr. Beaty addressed Plaintiff's adaptive behaviors by discussing his education, activities of daily living, and part-time work at a janitorial job. Dr. Beaty also specifically noted that Plaintiff exhibited adaptability through his survival on the streets since age 15. (R. 390–99.)

In making his ultimate findings, Dr. Beaty stated that "[w]hile his Full Scale score was in the Mild range of intellectual disability, his verbal comprehension and perceptual reasoning scores were in the Borderline

---

[6] As discussed above, the results of the mental status exam were as follows: Plaintiff's speech, thought process, and thought content were normal. He was able to count backwards and recite the alphabet, although he did have difficulty with some of the mental math computations. He was verbally responsive, but he did have poor insight and abstract ability. He was also able to recall three digits forward, three digits backwards, and two of three words after five minutes. Although he would confuse dates, he was able to give a roughly coherent account of his life. (R. 391–92.)

range, and that together with his account of his adaptive day-to-day behaviors led to the diagnosis of Borderline Intellectual Deficit." Thus, although Dr. Beaty found that Plaintiff's Full Scale score was 65, he nonetheless concluded that Plaintiff's adaptive behaviors are higher than his IQ test scores. (R. 390–99.)  Dr. Beaty's opinion therefore constitutes substantial evidence upon which the ALJ properly relied in concluding that Plaintiff lacked the required adaptive functioning deficits.

The ALJ also relied in part upon Plaintiff's work experience in concluding that Plaintiff did not have the required adaptive functioning deficits. The ALJ noted that "[t]he evidence indicates that the claimant has engaged in work at substantial gainful activity levels, and he continues to work." (R. 22.) Plaintiff's past work includes working as a glasscutter modifying boats at Seabring Marine Industries; working as a dish washer and line server at Piccadilly Cafeteria; and working as a dish washer and prep cook at Pizza Hut part-time. Notably, Plaintiff never mentioned that these jobs ended due to any intellectual or mental difficulties.[7] Additionally,

---

[7] The record is unclear as to why Plaintiff left these jobs. The ALJ "noted that Dr. Beaty reported that claimant was frequently terminated from jobs because of his argumentativeness and oppositional behaviors. This assertion is contradicted by the claimant's sworn testimony, as he testified that he left his last 3 jobs because of: (1) a lay-off (2) the company going out of business, and (3) a lay-off secondary to problems concentrating after his mother's passing." (R. 24–25.)

at the time of the ALJ's decision, Plaintiff was also working part-time as a janitorial cleaner for ISS. Plaintiff further expressed to Dr. Benton and the ALJ (at the hearing) that he would work full-time if his hours were increased. (R. 34–40, 58–61, 64–65, 373-74, 390–91.) Plaintiff's work experience, therefore, further supports the ALJ's finding that Plaintiff lacked the required adaptive functioning deficits.

The ALJ also referenced Plaintiff's testimony in finding that Plaintiff did not have the requisite deficits in adaptive functioning.  In his written decision the ALJ noted that "[h]e [Plaintiff] also testified that he performs odd jobs, so he likely has some unreported income." (R. 22.) Specifically, at Plaintiff's initial hearing he testified that he earns money by doing odd jobs for people, such as raking yards, cutting grass, washing cars, and performing other maintenance repair. Plaintiff testified about these odd jobs when discussing his daily activities, which include performing these odd jobs, working part-time, living with friends, watching TV, and doing household chores. Plaintiff also readily admitted that there are no household chores that he is unable to do. (R. 61–63.) Plaintiff's testimony concerning the nature and extent of these odd jobs and his descriptions of his daily activities is further evidence that he lacked the necessary adaptive

functioning deficits.

Lastly, in relying on the medical records from Plaintiff's treating sources, the ALJ said that "the claimant's treating sources have not indicated 'intellectual disability' as an issue." (R. 22.) Plaintiff visited Shands in July 2013 and September 2014. There was no mention of intellectual disability in his records, and his neurological, psychiatric, and psychological exams all revealed normal results. Plaintiff also visited Meridian Behavioral Healthcare in May 2014, where although he had a severe depressed and anxious mood, his behavior and activity during the visit were cooperative and appropriate. He was diagnosed with post-traumatic stress disorder and depressive disorder, and there was no mention of any intellectual disability. Lastly, Plaintiff visited North Florida Regional Medical Center, and again there was no mention of intellectual disability, and his neurological and psychiatric exams revealed normal findings. (R. 322-29, 331–46, 352–59, 360–68.) Nothing in these medical records show that Plaintiff had any adaptive functioning deficits.

Although the ALJ did not specifically mention the other opinion evidence in the record in concluding that Plaintiff failed to meet the adaptive functioning requirements of Listing 12.05(C), that evidence also is

consistent with the other evidence of record which support the ALJ's determination that Plaintiff does not have the requisite deficits in adaptive functioning.

Dr. Bauer opined that Plaintiff did not have any significant limitations due to a mental impairment after noting that Plaintiff's physical and mental status exams were within normal limits. Dr. Hernandez found that although Plaintiff had some moderate limitations, he was capable of sustaining goal-directed activity in a routine setting with limited social contact. And Dr. Benton concluded—after reviewing Plaintiff's mental health history, examining Plaintiff, and listening to his testimony about his activities—that Plaintiff has "adequate capacity in the areas of understanding, memory, concentration, persistence, social interaction and adaptation to perform work for which he is suited." (R. 78, 94–96, 373–76.) These opinions offer further evidence that Plaintiff lacked the required adaptive functioning deficits.

For these reasons, substantial evidence supports the finding that Plaintiff failed to meet Listing 12.05(C), which requires, among other things, a showing that Plaintiff has deficits in adaptive functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00(A), 12.05. The record evidence

regarding Plaintiff's daily activities and behavior shows that Plaintiff has a greater degree of functioning from that suggested by his IQ scores alone.

Accordingly, the Court concludes that the ALJ appropriately found Plaintiff failed to meet the requirements of Listing 12.05 because he failed to show the requisite deficits in adaptive functioning, despite his IQ score of 65 and other severe physical impairments. *See James v. Comm'r, Soc. Sec. Admin.*, 657 F. App'x 835, 838 (11th Cir. 2016) (substantial evidence supported ALJ's finding that plaintiff with an IQ score of 65 did not meet Listing 12.05 because plaintiff's daily activities and behavior showed she had no adaptive deficit).

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 4th day of January 2018.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.